# CHARLESTON.

FERRELL v. FERRELL.

Submitted February 13, 1903.   Decided May 2, 1903.

1. SUMMONS—*Suit.*
   The issuance of a summons brings a suit into existence at its date.   (p. 519).

2. SUIT—*Equity—Summons—Infant.*
   Where there are only two defendants to a bill in equity, one adult, the other *infant,* and after summons issued, though not served, the bill is filed in term, with the consent of the adult, and the court appoints a *guardian ad litem* for the infant, and his answer is filed, there is thus a cause for the action of the court and it has jurisdiction to decree upon the matter of the bill, and its decree is neither void nor erroneous for the mere cause of want of service of the summons, or that the bill was not filed at rules.   (p. 519).

3. PROCESS—*Infant—Guardian ad litem.*
   There need not be service of process on an infant.   The appointment of a *guardian ad litem* and his answer for the infant stand in place of such service.   (p. 519).

4. DEED—*Mistake—Equity.*
   Equity will entertain a bill to reform a deed where it is alleged the scrivener has, by some mistake, so drafted it as to not execute the intention of the parties.   (p. 519).

5. DEED—*Mistake.*
   Generally, to warrant equity to reform a deed for mistake the mistake must be mutual; but where there are not two parties to the contract, and by mistake of the scrivener the instrument does not execute the purpose of the party executing the deed, equity will reform the deed at his instance.   (p. 520).

6. ERROR—*Decree—Bar.*
   A release of error in a decree will bar a bill of review to reverse it.   (p. 521).

7. SIGNATURE—*Contract.*
   If one sign a written contract without acquainting himself with its contents, he is estopped by his own negligence from asking relief against its obligation, if his signature is procured without fraud.   (p. 521).

Appeal from Circuit Court, Logan County.

Bill by Floyd Ferrell against F. A. J. Ferrell and others. Decree for plaintiff, and defendants Ferrell appeal.

*Reversed.*

CAMPBELL, HOLT & DUNCAN, SHEPPARD & GOODYKOONTZ, and H. K. SHUMATE, for appellants.

JOHN B. WILKINSON and JOHN S. MARCUM, for appellee

BRANNON, JUDGE:

F. A. J. Ferrell owning a tract of three hundred acres of land, had prepared the draft of a deed of gift, by which he proposed to divide the land between four sons, one named Floyd, and a daughter, Anna. He was then a widower. The draft bore date 4 May, 1881. By one of the sections of the deed he gave Floyd all the land from the mouth of Warm Hollow running up the river by given boundary. By another section he gave to his daughter his residence as shown below. He did not sign the draft. He concluded later to marry, and desiring to provide for the wife whom he was to marry, he took the draft to a lawyer, H. Clay Ragland, and stated this purpose to him, and told him that he desired his future wife to share equally with his daughter Anna that portion of land mentioned in the draft which he proposed to give to his daughter, and also that portion of the land which the draft gave to Floyd from Warm Hollow up to a rock fence above the same, so as to take from Floyd's land five or six acres of bottom land and a small portion of hill land, and requested the attorney to so amend the draft as to accomplish his intention, and the attorney interlined in the section relating to Anna and Floyd the words, "and it is further provided that my future wife, whoever she may be, is to share equally with my daughter Anna, and in case she marrys to her lands is to be added all the land from the Warm Hollow up to the rock fence." This made the section read thus: "With condition that my daughter Ann Ferrell is to have the house I, F. A. J. Ferrell now lives in and the field and orchard around the houses and timbers and coal enough to support the land and fire during her natural life-time, that is to say as long as she remains a single woman and at her decease then the lands and

houses is to belong to my son Andrew T. Ferrell's part and it is further provided that my future wife whoever she may be is to share equally with my daughter Anna and in case she marrys to her lands is to be added all the land from the Warm Hollow up to the rock fence."

The section giving land to Floyd Ferrell was by inattention left unchanged in the draft. Without reading the paper, and being told by the attorney that he had made the proper changes in the deed to carry out his intention, he signed and acknowledged the deed, and lodged it in the clerk's office. The said F. A. J. Ferrell married shortly after this. The town af Matewan occupies the portion of land given by the deed to Floyd Ferrell lying between the Warm Hollow and the rock fence, the five or six acres which it was designed to take from him and give to the wife, and Ferrell and wife having sold various lots in the town the defect in the deed was discovered, and the question of the title to the lots arising, F. A. J. Ferrell sued out, 1 April, 1893, a summons in a chancery suit against Floyd Ferrell and Mary Ferrell, wife of F. A. J. Ferrell, to reform and correct said deed so as to make it carry out the intention of its maker. Floyd Ferrell was an infant, and the summons was not served or returned; but on 21 April, 1893, in the open court of Logan County, Ferrell filed his bill, with consent of his wife, and H. C. Ragland was by the court assigned guardian *ad litem* for Floyd Ferrell, who filed a formal answer for the infant placing the infant's rights under the protection of the court. Mary Ferrell filed an answer. Depositions were taken by the plaintiff. The cause resulted in a decree reforming the deed in the respect already indicated. This decree dates 9 September, 1893. On 5 April, 1901, Floyd Ferrell filed a bill of review to reverse the decree for error of law. F. A. J. Ferrell and his wife defended this bill of review. Later Floyd Ferrell made a paper under seal called a power of attorney constituting H. C. Ragland his attorney and counsellor and directing him to dismiss the bill of review, and releasing all error in the decree which it was filed to reverse. Motion to dismiss was made by Ragland, and resisted by the attorneys, Marcum & Wilkinson, who filed the bill of review, and time was given them to file affidavits to oppose the motion for dismissal. Later Floyd Ferrell sent Ragland a letter saying that he had been informed that Ragland had filed

"some sort of paper" authorizing him to dismiss the suit, and saying that he did not know what paper it was when he signed it; and that he had employed Marcum & Wilkinson to represent him, and wished the suit prosecuted, and requesting Ragland to withdraw the paper and surrender it to Marcum & Wilkinson. A motion to withdraw this paper was made and resisted by Ferrell and wife. Floyd Ferrell filed his own affidavit that he went to Logan C. H. to look after the suit, and while there "his father and Thomas West and others kept after him to get him to sign some sort of paper about the matter, and he refused several times to do so, but finally, to get rid of them, he signed the paper without at the time knowing what it was, or that it contained authority to dismiss his bill."

The answer of Ferrell and wife to the bill of review was filed 24 July, 1901, and no response was made to it until 1 November, 1901, when the court overruled exceptions to the answer then made for the first, and the plaintiff replied generally to the answer, and moved to submit the case, and the defendants opposed the motion and asked a continuance to give time to take proof to support their answer, and also moved that persons named in their answer as having purchased lots in the litigated land be made parties, and the court took time to consider. On the next day the court made a final decree allowing Floyd Ferrell to withdraw said power of attorney, and refusing to continue the case, and refusing to make such new parties; and finding error in said decree of 9 September, 1893, and reversing that decree, and overruling a motion of Ferrell and wife to remand the original cause to rules for process and to mature the same, and striking the case from the docket. From this decree Ferrell and wife have appealed.

We must find whether there is error of law in the decree which was reversed by the decree entered upon the bill of review, and in doing so we must look only for error apparent on the face of the record, and cannot look at depositions, as this is a bill of review for error of law, not new evidence. *Dunn* v. *Renick,* 40 W. Va. 349.

One point made against the decree is that no writ was served on Floyd Ferrell, and the court had no authority or jurisdiction to docket the cause. The summons was not returned, the bill was not filed at rules, but in term, and no rules taken upon it.

There were but two defendants, Mary Ferrell, who appeared and consented to the filing of the bill, and the infant Floyd Ferrell, who appeared by guardian *ad litem*. When the summons issued there came into existence a suit. Service of process is only to notify the parties of the suit. What need of it in this case as to the infant? Code, chapter 125, section 13, dispenses with service upon an infant, and makes the appointment of a guardian *ad litem* take its place. Though served, there must be a guardian, and service is entirely useless, as it performs no office. *Alexander* v. *Davis,* 42 W. Va. 465. Pleadings may be filed either at rules or in term in open court. *Bank* v. *Distilling Co.,* 41 W. Va. 530. The only purpose of rules is to give a process of maturing the case for hearing; but the case comes at last in the court for its action. Here there was no need of maturing. The appearance of the parties dispensed with that. The case was in court; it was not out in the country. The bill, just where it must have gone at last had it been filed at rules.

Another point made against the decree is that the court had no authority to appoint a guardian *ad litem*. As there was *in esse* a suit, the Code gave express authority and mandate to appoint one. As to the appointment of Ragland. He was not an unfit person for guardian simply because he amended the deed and was after appointment and filing his answer compelled to give testimony by F. A. J. Ferrell. He filed the usual answer placing the infant's interest under care of the court.

Another point made against the decree is that it was contrary to law. Here it is said that the bill shows that when the draft of the deed had been amended, Ferrell did not read it, and is thus guilty of negligence. The bill shows that he was misled by the assurance of the attorney that the draft had been so amended as to work the intent he had in mind, and that he was unlearned, and would hardly have discovered the mistake had he examined the papers. If, in fact, the scrivener did make the mistake, should this inadvertence preclude relief and destroy the right of Mary Ferrell? "Mistake may be defined to be some unintentional act, omission or error arising from unconsciousness, error, ignorance, forgetfulness, imposition or misplaced confidence." Kerr, Fraud and Mistake, 396. In this case the paper failed to carry out the intent from error or defect of expression; the scrivener did not use language to make

it do so. "An error of expression occurs when the parties enter into an agreement, and afterwards, in reducing its terms to writing, make a mistake, so that the instrument does not express the contract it was intended to evidence." 20 Am. & Eng. Ency. L. 821. Here there was no agreement, but there was fixed intent and purpose not carried out. "Where it is clear that an instrument does not express the intent of the parties, owing to the innocent omission or insertion of a material stipulation, equity has jurisdiction to grant relief by way of reformation on ground of mistake." "Thus where there is a mistake of a scrivener which prevents the instrument from expressing the intent of the parties, it will be reformed." 1 Am. & Eng. Dec. in Eq., 239; *Western Mining Co.* v. *Peytona Co.*, 8 W. Va. 406; *Allen* v. *Yeates,* 17 *Id.* 128; *Lough* v. *Michael,* 37 *Id.* 679; *Keen* v. *Kerns,* 47 *Id.* 575; 2 Pomeroy Eq. section 853. But it is said to call on equity to reform a document the mistake must be mutual, and a mass of citation is made to support the proposition. This is true. Where it is a mistake of both parties, equity will reform; where of one party only, it cannot reform, because of mistake of that one only, as that would impose on the other a contract he never assented to, and the court would not reform, but rescind. The demand of mutuality does not, however, apply to a mistake that is one purely that of a scrivener. "Where a contract is explained by the parties, and he is directed to prepare a deed in accordance with such explanation, he may be properly regarded as agent of both parties, and his mistake in preparing the instrument will be deemed the mistake of both; or rather, proof of his instructions will be proof of the precedent agreement, and the discrepancy between these instructions and the instrument as drawn will be evidence of the mistake." 20 Am. & Eng. Ency L. 823. "Where there is no mistake as to the terms of an agreement, but through a mistake of the scrivener, or by any other inadvertence in reducing it to writing, the instrument does not express the agreement actually made, it may be reformed by the court; it is only where an action is to reform the agreement itself that it is necessary to allege in the pleadings and prove on the trial that the mistake was mutual." *Born* v. *Schrenkeisen,* 110 N. Y. p. 55. In *Pitcher* v. *Hennessey,* 48 N. Y. 424, the court held that where there was no mistake about the agree-

ment and the only mistake alleged was in the reduction of that agreement to writing, such mistake of a scrivener, or of either party, no matter how it occurred, may be corrected. And we read from *Steins* v. *Hays*, 36 N. J. p. 364: "The jurisdiction of the court of chancery to relieve against deeds drawn up by a mistake contrary to the intention of any of the parties is, said Mr. Spence, of a very early date. 1 Spence Eq.. Jur. 633." It would seem queer that where there is no contract on valuable consideration, but a father in making a deed giving his land to his children, directs a scrivener to do a certain thing, and by mistake he fails, there can be no relief for want of mututality. What right has Floyd Ferrell? He has paid nothing. So held in *Mitchell* v. *Mitchell*, 40 Ga. 11, because the grantee was a volunteer.

This is enough to decide the case, because seeing no error of law in the decree, that ends the bill of review; but it seems, further, that if there were error of law, it was released by the power of attorney, and it was error to allow the retraction and disregard it in the decree on the bill of review. That paper was delivered and entered in the case. It at once operated. "The defendant in error may plead release of all errors, or a release of all suits; and these pleas, if found for him, will forever bar the plaintiff." 3 Bacon, Abridg. 380. "And a release of errors in the same instrument with the warrant of attorney is good." *Ibid.; Meirs* v. *Wilson*, 2 H & Munf. 268; 2 Cyc. 1007. True, Floyd Ferrell says he signed a power of attorney to get rid of importunity and did not know what he was signing. A poor excuse. Can it be expected that a court would entertain such a plea to a solemn sealed instrument importing sufficient consideration? End of litigation and peace and danger of liability for costs is a good consideration. It is law as old as the hills that a sealed instrument imports consideration. A deed is good without consideration—the seal imports it. 2 Minors Inst. 663. Unless a statute allows, the consideration imported by a seal cannot be controverted, or that it was not intended. 3 Minor 150, 152. "One is never required to, and never should, execute a written instrument without first becoming fully acquainted with its contents. He should read it, if able; or if illiterate, have it read to him. And when he has signed a written contract, the law *prima facie* presumes that he

discharged this duty; therefore, whether in fact he did it, or chose to waive the privilege, the signature binds him." Bishop, Contracts, section 346. He does not pretend that it was misread, or that he directed a writing operating otherwise, or that duress was used. The simple truth is, he meant it at the time; he meant to let the second wife and little children of his aged father have something for home and bread, because he thought it just and humane, as it was; afterwards from persuasion or other cause he changed his mind. In diefference to counsel, I refer to some cases cited in opposition to the view just stated. *Girard* v. *St. Louis,* 65 Am. St. R. 556. It holds that to a plea of release in an action for personal injury a reply that the release was obtained by fraud, while the plaintiff "was unable from pain and suffering from the injury to comprehend his act in signing it, and that he never assented thereto," was a good answer to the plea. Was there any ailment disabling Floyd Ferrell when he signed this release? He does not say so. Another cited case is *Lord* v. *American,* 46 Am. R. 815, holding that a release "signed without knowledge of its contents without any intention to execute such an instrument is inoperative." But the party was not able to either read or write English. Floyd Ferrell could do so, we presume. Another case is *Bliss* v. *N. Y. C. Railroad,* 39 Am. St. R. 504, holding that if a plaintiff testifies that soon after a railway accident "while suffering from it and dazed and rattled thereby," he was taken to the office of the railroad company, and asked what the damage to his clothing was, and on stating what it was, two papers were presented, one of which he understood to be a bill for such clothing, " and the other was said by an officer of the company to be a mere matter of form," and he signed both papers without reading, and accepted the sum named as damage to his clothing, and the papers were a receipt for, and release of, damages for the personal injury, this was sufficient evidence, to go to the jury of fraud in procuring the papers. Certainly. Here were bodily pain incapacitating the party for businesss, ignorance of the contents of the papers, actual false representation as to the character of the papers—actual fraud. What has that case to do with this? To the contrary, from the same state from which the second case comes, Wisconsin, we have *Albrecht* v. *Milwaukee Co.,* 41 Am. St. R. 30, holding that "one woh has

signed a written instrument, without being induced by fraud or deception, cannnot avoid its effect on the ground that at the time he signed the paper he did not read or know its contents. And the fact that the party could not read English or understand the contents of the paper is no excuse." See note p. 33, and *Borden* v. *Richbond,* 37 Am. St. R. 632, and note 635, containing abundant authority to sustain this holding.

Argument against this release is made on the ground that Ferrel's counsel was not consulted, and we are cited to some remarks from the Wisconsin court found in Bailey on Master's Liability for Injuries to Servants, 487, to the effect that a release after action begun and counsel employed, in his absence, should not bind the party, unless the utmost good faith is shown. Here I ask where is any bad faith on the part of the father shown? It may be, though we cannot say, that the father and his friends may have urged the son not to ruin his father by taking the land and render him in old age liable to breach of covenant for lots sold, and impoverish his little children. This was not fraud. It was entirely permissible. What right had this son to property which his father had, by mistake, given him without pay, to the bankruptcy of father, wife and children? Was it improper for the father and his friends to address such considerations to the son on the score of humanity and filial duty? Was this fraud? Was this bad faith? Was it fraud thus to seek peace from litigation with a son in old age? Which had the higher moral claim, father or son? Whose property? When we come to look at the Wisconsin case from which the remarks cited from Bailey are taken, we find that the remarks were used in a case where a railroad company got the release from the injured woman when she had no advice, and her physician, acting on behalf of the company, urged her to execute it, though she desired to postpone it until she could see her counsel. The company agent told her the company would defeat her, and if it did not, her counsel would absorb her recovery by fees. There is nothing akin to that in this case. We have not access to two other cases cited, but from quotations from them they have little or no bearing on the case. But though his release was a positive bar to the bill of review it can be utterly dispensed with, and still the case is for F. A. J. Ferrell for the simple reason that there is no error of law

on the face of the record of the decree sought to be reversed by the bill of review.

We reverse the decree pronounced upon the bill of review on the 1st day of November, 1901, and dismiss the bill of review.

*Reversed.*